**MASTER et al.**

v.

**CHALKO et al.**

1999-Ohio-1310.]

Court of Common Pleas of Ohio,
Cuyahoga County.

No. CV 272373.

Decided Feb. 3, 1999.

Harold Pollock, for plaintiffs.

Gallagher, Sharp, Fulton & Norman and Timothy T. Brick, for defendant Paul Chalko.

Nancy C. Schuster, for defendant Susan A. Sazima.

Nurenberg, Plevin, Heller & McCarthy, Anne Kilbane and Ellen M. McCarthy, for defendant Susan A. Sazima on her motion for sanctions.

Richard S. Koblentz, for Harold Pollock on Susan A. Sazima's motion for sanctions.

---

THOMAS PATRICK CURRAN, Judge.

## Introduction

{¶ 1} This opinion and order centers upon a claim of Cleveland Police Officer Sue Sazima for reimbursement of attorney fees and expenses arising out of the instant litigation.[1] In 1987, the Ohio legislature passed a law aimed at compensating victims of frivolous litigation. R.C. 2323.51.

{¶ 2} This court finds that the statutory motion was timely filed and that the parties and their attorneys were given adequate notice of the several hearing dates—spanning several months. This court finds that the motion is well taken and that attorney Harold Pollock and the law firm known as Harold Pollock Co., L.P.A., engaged in frivolous conduct against Sue Sazima throughout the pendency of this action and indeed even into the motion stage when Sazima and her counsel were seeking redress under R.C. 2323.51. This court further finds that Sazima was "adversely affected" by the frivolous conduct, which will hereafter be described and analyzed. Further, this court finds that Sazima has incurred litigation fees totaling $78,504.81. Further, this court finds that John Nix, as a fiduciary of the estate of John Master, deceased, and John Nix, personally, and the estate of John Master, deceased, each ratified and/or was caused to ratify the frivolous conduct of counsel. Further, this court finds that, under the totality-of-circumstances test, these entities not only ratified the frivolous conduct of counsel but willingly participated in such conduct at every important stage of the proceedings. Therefore, in accordance with these findings, judgment will be appropriately entered.

## Background Leading to Litigation

{¶ 3} The instant case is but one of some 19 individual lawsuits[2] instituted by attorney Pollock and his client John Nix, arising out of Nix's friendship with the

---

1. The Cuyahoga County Court of Appeals affirmed this opinion and order. See *Master v. Chalko* (May 11, 2000), Cuyahoga App. No. 75973, 2000 WL 573200.

2. Pollock offered this number—19—at the hearing of December 16, 1998.

late Dr. John Master, a Cleveland physician. The underlying facts have been described in several opinions, in different settings, once by the Supreme Court of Ohio, per curiam, and twice by the Ohio Court of Appeals, per Judge Porter and Judge Karpinski: *State ex rel. Nix v. Cleveland* (1998), 83 Ohio St.3d 379, 700 N.E.2d 12; *Master v. Chalko* (June 5, 1997), Cuyahoga App. No. 70527, 1997 WL 298260; and *Nix v. Chalko* (Feb. 19, 1998), Cuyahoga App. No. 72023, 1998 WL 72495.

{¶ 4} The underpinnings of this expansive and contentious litigation are tied to an aging widower/physician who survived his physician spouse (Dr. Anne Master) and who came into contact with John Nix, a virtual stranger and a licensed securities dealer. Nix developed a personal relationship with Dr. John's housekeeper and moved into the Master residence. Nix then formed a legal partnership with both the housekeeper and Dr. Master to develop housing on undeveloped property contiguous with the Master residence. *State ex rel. Nix*, supra, 83 Ohio St.3d at 380, 700 N.E.2d 12. In connection with these business and personal relationships, and the ensuing death of Dr. John, Nix eventually became the beneficiary of the estate. In fact, so far as the evidence in this case has demonstrated, John Nix became the alter ego of the estate and Pollock his foil.[3]

{¶ 5} Sue Sazima was the blood niece of the late Dr. Anne Master. Believing that her Uncle John was in need of protection from Nix, Sazima consulted with attorney Chalko, who was the long-time family attorney of the Masters. Chalko, in turn, explored guardianship with the probate court. For this conduct, both Dr. John Master and Nix, as co-plaintiffs, filed suit and raised claims against Chalko for legal malpractice and against Sazima for interference with Dr. John's rights as a client of Chalko. The defendants were joined as civil co-conspirators. (Dr. John died prior to the commencement of the jury trial, and his estate was substituted as a party plaintiff.)

{¶ 6} At the conclusion of the plaintiff's case, this court directed a verdict in favor of Sazima. Within the twenty-one days required by R.C. 2323.51, Sazima filed a motion for attorney fees as sanctions for frivolous conduct. This court then stayed the proceedings during the pendency of the appeal by co-defendant Chalko. (No appeal was prosecuted by the plaintiffs regarding the adverse ruling dismissing Sazima as a co-defendant.) Ultimately, the court of appeals determined that there was insufficient evidence to support the verdict against Chalko, and reversed the judgment against him. The court of appeals has ruled that Paul Chalko is free of any liability to Nix or to the estate of the Masters.

---

3. Nix testified that he purchased the housekeeper's interest in the partnership when his personal relationship with her came to an end. The partnership therefore currently consists of Nix and his alter ego, the estate of Master. Nix is also the sole beneficiary of the estate of John Master.

This is the "law of the case." See *Painter v. Graley* (1995), 106 Ohio App.3d 770, 667 N.E.2d 78 (8th District). On the other hand, as a layperson who sought and received legal advice from Chalko, Sue Sazima was several steps removed from any liability that could be affixed against Chalko.

## The Pollock Approach

{¶ 7} In evaluating the conduct of Pollock vis-à-vis Sue Sazima, it is not so much that his theoretical approach was totally meritless but that he presented no evidence whatsoever to support his theory—and evidently never intended to do so. Pollock never questioned or appealed from rulings favorable to Sazima. Instead, by his own admission, Pollock pursued a proliferation of litigation against Sazima.[4] In addition, Pollock sued Sazima's trial counsel, attorney Nancy Schuster, to punish both Sazima and Schuster and to corrode Schuster's unfettered legal representation.[5] At the time this court granted the motion for directed verdict in favor of Sazima, Pollock approached her at the trial table and said to her: "I will sue you again and again and again." This was no idle threat.

{¶ 8} It is apparent then that Pollock has treated the instant lawsuit against Sazima as a *tour de force* for the sole purpose of tormenting her, of harassing her, and of maliciously injuring her reputation and her pocketbook—all of which he has accomplished.

## Badges of Hatred and Enmity

{¶ 9} R.C. 2323.51, defining "frivolous conduct" as a term of art, provides a statutory remedy against litigation that "obviously serves *merely* to harass or maliciously injure another party to the civil action." (Emphasis added.) To act with actual malice is to act with a spirit of revenge, needlessly and gratuitously to injure another, and/or to act cruelly, or to "do evil" to another person. Oxford Encyclopedic Dictionary (1st Ed.1991). The contempt and enmity that Pollock and Nix visited upon Sue Sazima were extraordinary. Here are some examples:

{¶ 10} Filing lawsuits seeking to deprive Sazima of the protection of insurance companies that might otherwise have been induced to provide Sazima with a defense and/or indemnity protection.

{¶ 11} Telephoning and/or writing to insurance companies in order to persuade potential insurers to deny Sazima a defense and/or indemnity protection.

---

4. Five separate suits in different courts, according to Pollock.

5. Pollock also sued attorney Nicholas Fillo, who had the temerity to defend litigants in related cases.

{¶ 12} Engaging in personal invective against Sazima in court hearings not simply publicly but also in private conversations with her, particularly when the trial court granted her motion for directed verdict at the conclusion of Nix's case.

{¶ 13} Accusing Sazima of being a corrupt police officer in a written communication to the Cleveland Civil Service Commission.

{¶ 14} Seeking the return of a true bill (felony indictment) against Sazima in a written communication to Stephanie Tubbs Jones, Cuyahoga County Prosecuting Attorney.

{¶ 15} Filing multiple lawsuits against Sazima in both state and federal court, accusing her of criminal conduct.

{¶ 16} Seeking openly to damage Sazima's reputation with the Chief of Police of the Cleveland Police Department.

### The Pollock Admission

{¶ 17} Pollock grudgingly admits to a pattern and practice of seeking to destroy his legal adversaries. For example, in suing Sazima's trial counsel, attorney Nancy Schuster, Pollock first denied attempts to interfere with her legal malpractice coverage; yet, when confronted with such an accusation in open court, Pollock admitted to that very practice and fairly well boasted that he had patterned his litigation practices after those designed by third parties to deny President Clinton an insurance defense in the celebrated Paula Jones cases.[6]

### The Code of Professional Responsibility

{¶ 18} Several exhibits offered in support of the motion demonstrate a concerted effort by Pollock to seek criminal prosecution of Sazima. *These documents make specific reference to the instant civil litigation.* Tying a criminal mens rea to a pending civil action may be contra to the aspirational standards of the Code of Professional Responsibility. The code was adopted by the Supreme Court some 28 years ago and is designed to impress upon the practitioner the notion that the practice of law is a profession—a high calling.

{¶ 19} The code is divided into three parts. Beginning with the canons, the practitioner is placed on notice that the legal profession has minimum standards—axiomatic norms—which define the lawyer in his or her relationships with the public, with the legal system, and with the legal profession. These canons embody general concepts from which are derived the second and third parts of the code: Ethical Considerations ("EC") and Disciplinary Rules ("DR"). The

---

6. The accusation was made by attorney George Coakley, who represents attorney Schuster in litigation filed by Pollock in behalf of Nix. The practice is especially repugnant when instigated by the very party who is seeking compensation in the underlying case.

Ethical Considerations are aspirational in character. The Disciplinary Rules are mandatory in character.

{¶ 20} In the context of this case, and more particularly the treatment of Sue Sazima by Nix and his attorney, the aspirational norms of EC 7–21 may well have been disregarded:

"EC 7–21 The civil adjudicative process is primarily designed for the settlement of disputes between parties, while the criminal process is designed for the protection of society as a whole. Threatening to use, or using, the criminal process to coerce adjustment of private civil claims or controversies is a subversion of that process; further, the person against whom the criminal process is so misused may be deterred from asserting his legal rights and thus the usefulness of the civil process in settling private disputes is impaired. As in all cases of abuse of judicial process, the improper use of criminal process tends to diminish public confidence in our legal system."[7]

{¶ 21} An integral component of the Nix litigation against Sazima was personal invective. Sazima has been variously described by Pollock, in letters to public officials and commissions as "a thoroughly dishonest cop" (Exhibit 6); "a disgrace to Cleveland's Police Department" (Exhibit 1); a person who committed insurance fraud by seeking a defense and indemnity in regard to litigation instigated by Pollock (Exhibit 3); a person who raised a "red flag" that she was a criminal because she invoked the Fifth Amendment in a civil deposition (Exhibit 6); and a person who engaged in illegal conduct (Exhibit 8).

{¶ 22} These communications tarnished and subverted the judicial process because they were directly tied to gain a civil advantage. Furthermore, it is not simply acting maliciously that defines "frivolous conduct," but acting "merely" for malicious purposes, or "merely" to harass; "merely" meaning "only." Under the totality of circumstances, this court can find no reason for the instant litigation against Sazima except enmity, hatred, ill will, a spirit of revenge, and the infliction of financial damage in the form of litigation expenses.

### The Essential Objective of Civil Litigation

{¶ 23} When a civil lawsuit is filed in the state of Ohio, it is appropriate at the earliest stages for the trial court to ascertain the essential objective of the moving party. In its most basic form, a civil complaint seeks either equity or law, or a combination of both. A complaint in law has the essential objective of obtaining money from one's adversaries. A complaint in equity may entail one or more of several possible objectives—those secured by a "court of chancery" (viz., which is

---

7. Little wonder that Sazima, although denying that she wiretapped Nix, invoked protection against self-incrimination.

to say ordinarily without the need or right of a jury). These could be declaratory judgment actions, which have as their essential objective judicial rulings of one's rights—typically those associated with written instruments. Pure equity actions (in their historical sense) seek injunctive relief—either positive (as in mandatory injunctions) or negative (as in restraining orders).

{¶ 24} When one examines the amended complaint, which brought Sazima into CV 272373, one perceives an endeavor of Pollock to obtain money damages against her in the aggregate amount of $750,000. But his motives are betrayed by his lawsuits against Sazima's insurance carrier in yet two other lawsuits—one filed in this court and one filed in federal court. These filings seek judicial declarations that Sazima be deprived of an insurance defense and an indemnity. This tactic—one of push and pull—represents a pattern and practice that Pollock has pursued with numerous defendants in regard to Nix and/or the Master estate. It was indeed this very practice that Pollock pursued against attorney Nancy Schuster, Sazima's trial counsel. But Pollock did not stop there. He asked further that Sazima be forced to repay her insurers for any legal sums expended in her defense. When a litigant's conduct is so patently self-destructive as to trump the essential objective of civil litigation, the hidden motive behind the suit becomes transparent.

### Defending Against the Motion

{¶ 25} The invective and hyperbole hurled at Sazima drifted into the trial court's hearing held pursuant to R.C. 2323.51. The essential defense presented by Pollock and his attorneys has been to defend against the motion as if it were a full-blown trial. This was inappropriate. Cf. *Riley v. Langer* (1994), 95 Ohio App.3d 151, 642 N.E.2d 1 (1st District).[8] The irony of this case is that Nix has testified that Pollock has charged him zero legal fees for all of the litigation to date against Sazima. By the same token, Pollock's attorneys represent that they are defending him *gratis*. Nevertheless, as a measure of the gargantuan legal attack against Sazima, Nix has testified that his court costs and expenses (sans fees) amount to some $60,000. For herself, Sazima has been forced to mortgage her residence in order to pay her own legal fees.

### The Law

{¶ 26} Although there are many reported cases applying R.C. 2323.51, three cases seem to this court to have special significance. The first principle is

---

8. The hourly rates of attorney Schuster and attorney Kilbane were not just questioned but disparaged. Counsel for Pollock, whose own hourly rate is $225, argued that Kilbane and Schuster should have hourly rates no higher than $200. Furthermore, Schuster extended Sazima a professional discount, which was below $200. On the other hand, attorney Brick submitted his fee bill to this court under seal. Brick's fees present a valid yardstick against which to measure the validity and reasonableness of legal fees incurred by Sazima.

reflected in *Mulchester Farms Inc. v. Mullin* (1989), 57 Ohio Misc.2d 34, 565 N.E.2d 1291, in which Judge Ferguson of the Elyria Municipal Court observed that trial courts should seriously reflect upon the nuances of the particular case. Statutory awards of attorney fees for frivolous conduct should be awarded only after thoughtful consideration. The second point worthy of note is that trial judges are granted "substantial deference" by reviewing courts on findings of "frivolous conduct" under that prong of the definition relating to harassment and malicious conduct. Hence, the need for prudence and caution. On the other hand, frivolous conduct also includes by definition groundless attempts to modify or change the law. Here, such findings are nondeferential notions that merit a freshly independent review by an appellate court. See *Lable & Co. v. Flowers* (1995), 104 Ohio App.3d 227, 661 N.E.2d 782 (9th District). The third point worthy of the reader's attention is more an observation than it is a legal principle. Decisions that conclude with an award of attorney fees require judicial courage. See *Ceol v. Zion Industries, Inc.* (1992), 81 Ohio App.3d 286, 292, 610 N.E.2d 1076 (9th District):

> "The important policy considerations advanced by the legislation nevertheless demand that sanctions be imposed whenever appropriate. In *Turowski v. Johnson* (1990), 68 Ohio App.3d 704, 589 N.E.2d 462, this court recognized that an abuse of discretion is committed when a request for attorney fees is arbitrarily denied. In a second appeal following remand, it was further remarked that while an award of less than reasonable attorney fees may be properly made, trial courts 'must have the courage' to further the goals of the statute."

{¶ 27} The conduct of counsel and litigants adverse to Sue Sazima went beyond the pale of acceptable norms in the adversary process. When such events occur, the Ohio legislature has provided the tools for returning the victim to the status quo.

{¶ 28} It has been observed that nothing rankles more in the heart of man than the perception of an injustice. When a constellation of lawsuits is let loose solely for torment and financial ruin, courts should not turn a tin ear to the victim. A civil litigant should not be deprived of his or her essential dignity and financial integrity solely for vengeful reasons. Evening the score has its place in civil litigation when the instigating litigant, in the least, pursues a cause of action and not just a defendant. Meritless litigation must have some additional quotient—if not good faith, then perhaps the absence of bad faith. Otherwise, there is the statutory risk of having to compensate one's adversary for legal fees incurred. This is not so much a sanction as it is a return to the status quo.

## The Statutory Issues

{¶ 29} The issues before this court are defined by statute. They are three in number: 1. Did Pollock act frivolously as that term is defined in the statute? 2. Did Pollock's conduct cause damage to Sazima? And 3. What is the reasonableness of attorney fees attributed to such conduct?

{¶ 30} This court finds that Pollock acted frivolously within the meaning of the statutory definition; further, that Pollock's frivolous conduct caused damage to Sazima and that the amount of attorney fees incurred by Sazima as a result of such frivolous conduct is $78,504.81, of which $65,504.81 represents legal fees and expenses of attorney Nancy Schuster and her associates. The balance, or $13,000, represents legal fees of attorney Anne Kilbane and her associates in pursuing the instant motion. Attorney fees expended in pursuing motion practice under the sanction statute are compensable. *Ron Scheiderer & Assoc. v. London* (1998), 81 Ohio St.3d 94, 689 N.E.2d 552. (Unanimous opinion by Chief Justice Moyer.) This court finds that the conduct of Pollock has been marked by malice, hatred, and a spirit of ill will against Sue Sazima, including verbal threats, multiple lawsuits, suits against her insurance company, a letter to the civil service commission calling her a "thoroughly dishonest cop," and other letters to public agencies, endeavoring not only to compromise her standing as a police officer but to seek her criminal prosecution—all of this in the context and in aid of the instant civil litigation.

{¶ 31} Pollock is a resourceful and indefatigable trial lawyer. Equipped with a wealth of experience, he is presumptively aware of the risks attendant upon pushing the litigation envelope. The practice of law is not a popularity contest, and those who labor in its vineyards are impressed with duties in at least three directions: to the client, to the bar, and to the court. Our Chief Justice has said it best:

"We have no desire to cause a chilling effect on the duty of counsel to vigorously represent their clients. Counsel, however, must balance that duty with their concomitant obligation to the bar, the court, and their client to perform responsibly *'within the bounds of the law.'* See Canon 7; EC 7–1 [of the Code of Professional Responsibility]." (Emphasis sic.) Id. at 97, 689 N.E.2d 552.

## Nix and Pollock

{¶ 32} On the record, and in open court, Nix was informed that he would be given the opportunity to disavow the harsh efforts directed against Sazima. It should be noted that the hearing pursuant to R.C. 2323.51 was interrupted and delayed by numerous procedural maneuvers. These included the filing of a writ to prevent the continuation of the hearing, a petition to disqualify the trial judge,

a request for rehearing of that petition *en banc* before the Ohio Supreme Court, and finally an interlocutory appeal.

{¶ 33} For several months, then, John Nix has had the opportunity to disassociate himself from the Rambo tactics of his attorney.[9] He has declined to do so, asserting that he is merely a fiduciary and immune from exposure. It should be remembered that Nix is not simply a fiduciary of the Master estate. For all intents and purposes, Nix *is* the estate.

{¶ 34} Under the totality of the circumstances test, this court finds as follows: (1) Nix is a willing participant in the litigation blitzkrieg advanced against Sazima, and (2) Nix has ratified the conduct of Pollock with full knowledge of the pattern and practices pursued against Sazima.

## ORDER

{¶ 35} This court, pursuant to R.C. 2323.51, finds in favor of the movant, Sue Sazima, and against the following defendants, jointly and severally: Harold Pollock, Harold Pollock Co., L.P.A., John Nix, John Nix as executor of the estate of Dr. John Master, deceased, and the estate of John Master, deceased. Accordingly, judgment is rendered in the total amount of $78,504.81 plus costs, jointly and severally against the five entities/persons above listed.

{¶ 36} IT IS SO ORDERED.

Judgment accordingly.

---

9. In addition to the several delays brought about by Pollock's extraordinary motion and appeal practice, Nix was accorded extensions for his recent marriage and honeymoon, as well as his mother-in-law's illness.